**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Anthony Lee, | ) | |
| | ) | |
| Plaintiff, | ) | No: 25-cv-01772 |
| | ) | |
| v. | ) | |
| | ) | |
| Wexford Health Sources, Inc. | ) | |
| Marlene Henze, Dianna Kucera, | ) | |
| Mitchell McGladdery, Helen Bruckner | ) | |
| Eileen Couture, | ) | |
| Dr. Stathis Poulakidas, | ) | JURY DEMAND |
| Presence Central and Suburban | ) | |
| Hospitals Network d/b/a Ascension | ) | |
| Mercy, and d/b/a AMITA Health Mercy | ) | |
| Medical Center, a/k/a AMITA Health | ) | |
| Aurora, also d/b/a Prime Healthcare | ) | |
| Services, Inc. a/k/a Prime Healthcare | ) | |
| d/b/a Mercy Medical Center, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## THIRD AMENDED COMPLAINT

Plaintiff, Anthony Lee, by and through his attorneys, Romanucci and Blandin, LLC, in this Complaint against Wexford Health Sources Inc., Dr. Marlene Henze, Dr. Diana Kucera, Nurse Mitchell McGladdery, Nurse Practitioner Helen Bruckner, Dr. Eileen Couture, Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora, also d/b/a Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center, and Dr. Stathis Poulakidas, pleading jointly and/or in the alternative, states as follows:

1

## I.     JURY DEMAND

1. Plaintiff Anthony Lee hereby demands a trial by jury.

## II.     JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## III.     PARTIES

4. At all times relevant, Plaintiff, Anthony Lee, ("Anthony") was a citizen of the United States, a resident of Will County, Illinois.

5. At all times relevant, Anthony was in custody of the State of Illinois's Department of Corrections and incarcerated in the Illinois Department of Corrections.

6. From March 16, 2023, to June 23, 2023, Anthony was incarcerated at Stateville Correctional Center ("Stateville"), a prison operated by the State of Illinois.

7. From March 16, 2023, to June 23, 2023, Anthony was incarcerated at Stateville, a prison managed by the State of Illinois.

8. From March 16, 2023, to June 23, 2023, Anthony was incarcerated at Stateville, a prison maintained by the State of Illinois.

9. Anthony is currently incarcerated at Joliet Treatment Center ("JTC"), a prison

operated, managed, and maintained by the State of Illinois.

10. At all times relevant hereto, Wexford Health Sources, Inc. ("Wexford") was a medical care contractor that provided medical personnel and services to the State of Illinois's Department of Corrections and the inmates in its custody.

11. At the time of the incidents involving Anthony, Dr. Marlene Henze ("Dr. Henze") was a family medicine physician who served as the Medical Director for Stateville.

12. At the time of the incidents involving Anthony, Dr. Henze was employed by Wexford.

13. At the time of the incidents involving Anthony, Dr. Henze was an agent or apparent agent of Wexford.

14. Dr. Henze is currently a medical doctor at JTC.

15. At all times relevant, Dr. Diana Kucera ("Dr. Kucera") was a clinical psychologist at Stateville.

16. At all times relevant, Dr. Kucera was employed by Wexford.

17. At the time of the incidents involving Anthony, Dr. Kucera was an agent or apparent agent of Wexford.

18. At all times relevant, Nurse Mitchell McGladdery ("Nurse McGladdery") was a registered nurse at Stateville.

19. At all times relevant, Nurse McGladdery was employed by Wexford.

20. At all times relevant, Nurse McGladdery was an agent or apparent agent of Wexford.

21. At all times relevant, Nurse Practitioner Helen Bruckner ("Nurse Practitioner

3

Bruckner") was a nurse practitioner at Stateville.

22. At all times relevant, Nurse Practitioner Bruckner was employed by Wexford.

23. At all times relevant, Nurse Practitioner Bruckner was an agent or apparent agent of Wexford.

24. At all times relevant, Dr. Eileen Couture ("Dr. Couture") was a nurse practitioner at Stateville.

25. At all times relevant, Dr. Couture was employed by Wexford.

26. At all times relevant, Dr. Couture was an agent or apparent agent of Wexford.

27. At all times relevant, Wexford acted as a state actor under color of law.

28. At all times relevant, Dr. Henze acted as a state actor under color of law and within the scope of their employment.

29. At all times relevant, Dr. Kucera acted as a state actor under color of law and within the scope of their employment.

30. At all times relevant, Nurse Mitchell acted as a state actor under color of law and within the scope of their employment.

31. At all times relevant, Nurse Practitioner Bruckner acted as a state actor under color of law and within the scope of their employment.

32. At all times relevant, Eileen Couture acted as a state actor under color of law and within the scope of their employment.

33. At all times relevant, Marlene Henze was the facility medical director for Joliet Treatment Center and Stateville Correctional Center.

34. At all times relevant, Dr. Stathis Poulakidas was employed by Presence Central and Suburban Hospitals Network d/b/a Ascension Mercy, and also d/b/a AMITA

Health Mercy Medical Center, a/k/a AMITA Health Aurora.

35. Presence Central and Suburban Hospitals Network is an Illinois not-for-profit corporation that has also done business as Ascension Mercy, Health Mercy Medical Center, AMITA Health Aurora. Reference to each and any of these entities, including AMITA Health Aurora, should be construed to include reference to the parent entity of Presence Central and Suburban Hospitals Network.

36. Mr. Lee received treatment from Dr. Stathis Poulakidas at AMITA Health Aurora, a full-service hospital and medical center providing emergency, medical, laboratory, imaging, and surgical car and all associated care to the general public, including Mr. Lee.

37. At all times relevant, Dr. Stathis Poulakidas acted as an agent or apparent agent and employee of Presence Central and Suburban Hospitals Network d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora.

38. At all times relevant, Dr. Stathis Poulakidas acted within the scope of his employment at Presence Central and Suburban Hospitals Network d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora.

39. At all times relevant, Nurse Priscilla Paramore ("Nurse Paramore") was a registered nurse working at Joliet Treatment Center.

40. At all times relevant, Nurse Paramore was an agent or apparent agent of Wexford.

5

41. At all times relevant, Nurse Ann Ohakasim ("Nurse Ohakosim") was a registered nurse working at Joliet Treatment Center.

42. At all times relevant, Nurse Ohakosim was an agent or apparent agent of Wexford.

43. At all times relevant, Nurses Paramore and Ohakosim were contracted through Wexford to work as nurses at Joliet Treatment Center.

## IV.    FACTUAL ALLEGATIONS

44. On February 25, 2023, Anthony set himself on fire in an act of self-harm.

45. As a result of his self-immolation on February 25, 2023, Anthony suffered third-degree, circumferential burns to his leg.

46. After Anthony set himself on fire, a Wexford nurse notified Dr. Henze and Dr. Kucera of the incident.

47. Dr. Henze and Kucera both relied on assessment of Anthony's wounds by conversation with Nurse Paramore and Nurse Ohakosim on February 25, 2023.

48. At the time that Nurse Paramore and Nurse Ohakosim assessed Anthony's wounds on February 25, 2023, Anthony's burns were yellow in color and had blisters that were "bursting during reassessment of restraints." This assessment was conveyed to Dr. Henze shortly after the occurrence via telephone.

49. Dr. Henze did not personally assess Mr. Lee at the time of the injury because she was in St. Louis, Missouri.

50. Dr. Henze was the physician on call for Joliet Treatment Center on February 25 and 26, 2023.

6

51.    There were no physicians on site at JTC on the weekends, including February 25 and 26, 2023.

52.    The only medical doctor to which people incarcerated at JTC had access on the weekends, including February 25 and 26, 2023, was the on-call physician.

53.    The on-call physician could ask another physician to cover for them if they were going out of town or would otherwise be unavailable but were not required to do so.

54.    Wexford maintained an official policy in which there were no restrictions on the conduct of on-call physicians.

55.    Wexford maintained an official policy in which on-call physicians would be unavailable to personally examine patients in the event of an emergency.

56.    As a result of this policy, Dr. Henze was permitted to travel to St. Louis while she was the on-call physician for JTC, depriving JTC inmates access to necessary medical care.

57.    In response to Anthony's burns on February 25, 2023, Dr. Henze ordered Silvadene and directed , Nurse Paramore and Nurse Ohakosim to wrap the wound in soft, dry gauze dressing.

58.    Dr. Henze prescribed Tylenol to Anthony.

59.    Dr Henze did not initially order ice to be used to prevent further burning within the lower extremity, nor to elevate the leg to reduce swelling, but did order both of those in the evening of February 26, 2023.

60.    Dr. Henze did not prescribe any other medications to treat the pain associated

7

with Anthony's burns.

61. Dr. Henze ordered Anthony to be placed in four-point restraints in response to his act of setting himself on fire.

62. Dr. Kucera ordered Anthony to be placed in four-point restraints in response to his act of setting himself on fire.

63. Anthony complained about the four-point restraints to Nurse Paramore and Nurse Ohakosim because they were extremely painful due to his burn injuries.

64. The Wexford nurses, Nurse Paramore and Nurse Ohakosim, called Dr. Kucera multiple times to request that she be permitted to remove Anthony's restraints.

65. The Wexford nurses, Nurse Paramore and Nurse Ohakosim, also called Dr. Henze and Dr. Kucera multiple times on February 25 and February 26 to request that they be permitted to remove Anthony's restraints on his burned lower extremity. Dr. Kucera advised the Wexford nurses, Nurse Paramore and Nurse Ohakosim, that Anthony must remain in four-point restraints.

66. Dr. Henze also advised the Wexford nurses, Nurse Paramore and Nurse Ohakosim, that Anthony must remain in four- point restraints.

67. Illinois Department of Corrections policy 04.04.103 (hereinafter referred to as "the Restraint Policy") provides several restrictions on the use of restraints for mental health purposes, including the following:

   a. Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other, less restrictive measures

8

have been found to be ineffective and to ensure the immediate physical safety of the individual in custody, staff member or others;

b. Restraints shall not be used as a disciplinary measure;

c. Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician, physician's assistant, nurse practitioner or a licensed clinical psychologist;"

d. The initial order for use of restraints shall not exceed four hours. Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond the termination of the initial order. If further restraint is required beyond the initial order and one extension, a new order shall be issued pursuant to the requirements provided herein and the Regional Mental Health Administrator shall be notified; and

e. Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an individual in custody in restraints for mental health purposes, medical staff shall conduct an examination of the individual in custody to ensure that: a) No injuries exist; b) Restraint equipment is not applied in a manner likely to result in injury; and c) There is no medical contraindication to maintaining the individual in custody in restraints.

68. Wexford staff are required to follow the policies of the Illinois Department of Corrections, including the Restraint Policy.

69. Dr. Henze and Dr. Kucera authorized the use of restraints on Anthony despite

9

his serious injury and the medical contraindication that restraints would further aggravate the burn and/or compromise circulation in a limb where the limb was severely injured and the circulation was already severely compromised. Further, no subsequent order after the initial four hour order was given until at least 15 hours later, in violation of Wexford and IDOC policy.

70. At all times relevant, Dr. Kucera had no training in the treatment of burn wounds.

71. At all times relevant, Dr. Kucera did not have any qualifications to direct the medical care of physical injury.

72. At all times relevant, Dr. Kucera was a clinical psychologist, not a medical doctor.

73. On February 25, 2023, Anthony exhibited the following symptoms:

   a. There were burn blisters on Anthony's lower right leg;

   b. Anthony was complaining of pain;
   c. Anthony's right foot was swollen;

   d. Anthony had no sensation in his right leg;

   e. Anthony's right shin was warm to the touch;

   f. Anthony's right leg has palpable pulses;

   g. There were blisters on Anthony's right shin;

   h. Anthony's right leg was red, brown, and white in certain areas.

74. Dr. Kucera and Dr. Henze were aware of the condition of Anthony's leg on February 26, 2023 because of the communications from Nurse Paramore and Nurse Ohakosim.

75. Anthony's symptoms on February 26, 2023, were indicative of compartment syndrome and a worsening burn injury.

76. A circumferential burn on an extremity, such as that which occurred to Anthony Lee on February 25, 2023, is known to lead to compartment syndrome, which is a surgical emergency.

77. Upon learning of Anthony's condition on February 25, 2023, Dr. Henze and Dr. Kucera ordered that Anthony be kept in four-point restraints.

78. Upon learning of Anthony's condition on February 25, 2023, Dr. Henze and Dr. Kucera failed to:

   a. Allow Anthony movement outside of his restraint;

   b. Order necessary therapeutic treatment for his symptoms;

   c. Develop or implement the necessary treatment plan to direct the treatment of Anthony's wounds;

   d. Make any efforts to emergently refer Anthony to a hospital;

   e. Make any efforts to emergently refer Anthony to a burn specialist;

   f. Ensure that Anthony's circulation or vascular status was monitored;

   g. Order Anthony's release from four-point restraints or at a minimum, removing the restraint on the burned area;

   h. Make any effort to collaborate with other medical providers regarding Anthony's care;

   i. Repeatedly assess the need for restraints;

   j. Take any other reasonable steps to treat Anthony's wound.

79. Burn injuries tend to evolve and change such that close attention to their

development is required to manage them.

80. Dr. Henze and Dr. Kucera knew that neither of them had qualifications or training in the treatment of serious burns yet directed the treatment and care of Anthony's wounds.

81. Anthony's burn compromised blood flow to his leg.

82. Dr. Henze and Dr. Kucera knew that Anthony's burn could compromise blood flow to his leg.

83. Dr. Henze and Dr. Kucera knew that the blood flow to Anthony's leg could be further compromised by keeping him in restraints.

84. Dr. Henze and Dr. Kucera knew that Anthony's wounds could significantly worsen if not treated appropriately.

85. Dr. Henze and Dr. Kucera's management of Anthony's burns, wounds, and restraints collectively and individually breached the standard of care of reasonably well-qualified physicians within their area of expertise.

86. On February 27, 2023, Stateville Lieutenants Cruz and Powell released Anthony from four-point restraints without permission from Dr. Henze or Dr. Kucera because they recognized that the four-point restraints were cruel and unusual given Anthony's medical condition.

87. On February 27, 2023, Dr. Henze finally referred Anthony to the hospital at Amita Health Aurora, but failed to do so emergently.

88. By the time Anthony arrived at the hospital, he no longer had a pulse in his right leg.

89. By the time Anthony arrived at the hospital, his treaters believed there was a

high probability of imminent-life-threatening deterioration that could result in multi-organ failure and/or the need for limb amputations.

90. Soon after Anthony arrived at the hospital, he received an escharotomy, a surgical procedure that involves cutting through burned skin to relieve pressure and improve circulation.

91. Anthony's treating providers noted that Anthony's presentation to the hospital was delayed.

92. Anthony's treaters at the hospital noted that "he has a high likelihood of loss of limb given the extent of injury and delay in presentation."

93. On March 1, 2023, Anthony received a skin graft on his right leg.

### A. Upon returning to Department of Corrections custody, Anthony developed an infection.

94. Anthony was discharged from the hospital on March 16, 2023, at which time his skin graft and wounds were in good condition.

95. In the afternoon of March 16, 2023, Anthony was transferred back to Stateville for care of his right leg burn and skin graft.

96. On March 16, 2023, Anthony arrived at Stateville with his skin graft intact and without signs of infection.

97. Upon returning to Stateville, Anthony required appropriate wound care treatment, including dressing changes and antibiotic ointments, to prevent the development of any infections.

98. On March 23, 2023, Anthony's wound began to show signs of infection, including slough and a foul odor.

99. On March 24, 2023, Wexford staff believed that Anthony's skin graft was infected.

100. On March 24, 2023, Anthony's wound was, in fact, infected.

101. In response to the infection, Wexford Nurse Practitioner Brianna Orr prescribed one tablet of Augmentin 875/125 by mouth once per day.

102. No other treatments or medications were given to Anthony in response to the infection.

103. Wexford practitioners did not order a wound culture or refer Anthony to the hospital or specialist upon learning of his infection.

104. More than a week after Wexford staff learned of the infection, Anthony was transported to Amita Health Aurora and seen by Dr. Shabirhusain Abadin, MD, at AMITA Medical Group.

105. Dr. Abadin removed Anthony's dressing and observed that Anthony's wound site was infected and not fully healing.

106. Dr. Abadin recommended that Anthony continue receiving antibiotics and scheduled him to return to AMITA Health Aurora for a three-month follow-up.

107. Anthony's 10-day Augmentin prescription elapsed on the same day that he saw Dr. Abadin.

108. At the time his Augmentin prescription elapsed, Anthony's wound was still infected.

109. Contrary to Dr. Abadin's instruction, Anthony's Augmentin prescription was not re-ordered.

**B. Wexford provided inadequate care and treatment of Anthony's infection, which had so severely deteriorated throughout the month of April 2023 to the point where the bone was exposed.**

110. Upon returning to Stateville from his appointment with Dr. Abadin on April 3, 2023, Anthony did not receive any antibiotics until April 29, 2023.

111. Throughout the month of April 2023, Anthony's wound continued to worsen.

112. Nurse McGladdery, Nurse Practitioner Bruckner, and Dr. Couture were responsible for Anthony's wound care and treatment.

113. Nurse McGladdery was responsible for evaluating Anthony's wound nearly every day between April 3, 2023, and May 5, 2023.

114. Nurse Practitioner Bruckner was responsible for evaluating Anthony's wound multiple times a week between April 3, 2023, and May 5, 2023.

115. Dr. Couture was responsible for evaluating Anthony's wound on a weekly basis between April 3, 2023, and May 5, 2023.

116. Prior to their treatment of Anthony Lee, Nurse McGladdery and Nurse Practitioner Bruckner had never cared for or treated a burn or graft site wound.

117. Nurse McGladdery, along with other Wexford practitioners, falsely noted that there were no signs of infection at Anthony's wound, even though they knew that the infection was worsening.

118. By April 12, 2023, every Wexford medical provider responsible for Anthony's care knew that Anthony's graft had failed, his wound was severely infected and rapidly worsening, and that he needed to go to a hospital and/or burn specialist.

119. Throughout the course of Anthony's care, Anthony repeatedly asked Wexford

15

staff for pain medication due to the excruciating pain at his wound site.

120. Throughout the course of Anthony's care, Nurse McGladdery repeatedly assured other medical providers that his wound was healing, even though he knew it was rapidly deteriorating.

121. Prior to April 27, 2023, Nurse McGladdery, Nurse Practitioner Bruckner, Eileen Couture, and other Wexford staff became aware that Anthony's wound had deteriorated so severely that his bone was exposed and visible yet did not take reasonable and necessary steps to facilitate a referral to a hospital or specialist or otherwise adequately treat his infection.

122. On April 29, 2023, Anthony received a wound culture test and an Augmentin prescription.

123. The results of the wound culture reflected that Anthony's wound was infected with three strains of bacteria, one of which is intrinsically resistant to Augmentin and two of which are likely resistant to Augmentin.

124. After receiving the wound culture results, Nurse Practitioner Bruckner ordered Anthony to be placed on Gentamicin, an antibiotic.

125. After consulting with Medical Director Henze, Nurse Practitioner Bruckner changed Anthony's medication regimen to Zosyn and Bactrim.

126. Nurse Practitioner Bruckner also prescribed and administered non-steroidal anti-inflammatory injections between May 1, 2023, and May 5, 2023.

127. Dr. Couture told Anthony that he should just take the antibiotics and "hold off" on the hospital because Wexford denied his authorization.

128. Throughout the month of April and the first week of May, Defendants

continued to administer treatment that they knew was ineffective instead of facilitating a referral to a hospital or specialist.

129. Between April 4, 2023, and May 5, 2023, Nurse McGladdery repeatedly assured Anthony that his wound was healing, even though he knew it was rapidly deteriorating.

130. Nurse McGladdery admitted to Anthony that he and the other members of his care team knew his bone was showing well before they referred him to another provider. Nurse McGladdery admitted that the staff was trying to handle the issue themselves despite knowing Anthony's condition was worsening.

**C. When Anthony is referred to the hospital, Dr. Poulakidas performed an unnecessary above-the-knee amputation.**

131. Anthony was finally transported to Amita Health Aurora on May 5, 2023. This was the first time he was sent to the hospital, a specialist, or outside provider in over a month.

132. Anthony was evaluated by Dr. Stathis Poulakidas at Amita Health Aurora, who determined that Anthony had a rejected graft, a wound on his lower right leg that had been "worsening," and exposed tibia bone.

133. When Anthony was evaluated by Dr. Poulkidas, Anthony's bone was infected.

134. Depending on the severity, a bone infection can be treated by surgery or other methods such as antibiotics.

135. Many bone infections can be successfully treated without surgery, especially when they occur in individuals who are in their 20s, such as Anthony.

136. Dr. Poulakidas did not conduct a reasonable investigation into the condition of Anthony's leg, did not consult with a physician who specialized in plastic surgery, and did not order any imaging of Anthony's leg..

137. Dr. Poulakidas decided that Anthony's leg would likely need to be amputated by looking at pictures taken on his colleague's phone, prior to ever physically evaluating Anthony's leg himself.

138. Dr. Poulakidas also relied on these cell phone pictures to determine that Anthony's infection was likely due to his own manipulation of the wound, but there was no evidence that Anthony had interfered with his wound. In fact, Anthony had not interfered with his wound.

139. When Dr. Poulakidas evaluated Anthony's bone, it demonstrated ulceration, which is contrary to the conclusion that the bone was entirely unsalvageable.

140. Dr. Poulakidas advised Anthony that he would require an above-the knee amputation and did not attempt to treat Anthony with alternative treatments before deciding to amputate his leg.

141. There were other treatment options available to Dr. Poulakidas that could have prevented Anthony from losing his leg, but Dr. Poulakidas did not employ any of those treatment options. Anthony was a candidate for more conservative treatments that did not require the amputation of a limb.

142. On May 6, 2023, Dr. Poulakidas amputated Anthony's leg above the knee.

143. Anthony's leg was more likely than not salvageable at the time Dr. Poulakidas decided to amputate it.

144. Anthony did not self-harm between the time that he received his skin graft and

the time of his amputation.

145. Anthony was compliant with his medication regimen between March 16, 2023, and the time of his amputation.

## COUNT I: 42 U.S.C. 1983
### Against Defendant Wexford Health Sources, Inc.

146. Each paragraph of this complaint is incorporated as if fully restated here.

147. At all relevant times, Plaintiff was incarcerated in the care, custody, and control of the State of Illinois.

148. At all relevant times, the State of Illinois had contracted Wexford to provide comprehensive medical services to inmates in the care, custody, and control of the State of Illinois's Department of Corrections (IDOC).

149. At all relevant times, Dr. Marlene Henze, Dr. Dianna Kucera, Nurse McGladdery, Nurse Practitioner Bruckner, and Eileen Couture were employed by and agents of Wexford and, pursuant to Wexford's contract with the State of Illinois, were acting under color of state law.

150. At all times relevant, Nurse Paramore and Nurse Ohakosim were agents of Wexford and, pursuant to Wexford's contract with the State of Illinois, were acting under color of state law.

151. At all times relevant, Anthony was suffering from a serious medical condition.

152. Anthony was deprived federal constitutional rights that is properly attributable to Wexford.

153. Wexford employs general and/or family medicine providers, but does not employ specialists or surgeons, so Wexford must refer incarcerated patients to

19

an external provider—such as a hospital—in order to provide specialty care.

154. According to their contract with the State, Wexford's compensation by the State is reduced "by an amount equal to what the State pays out for Hospital Service once Billed Charges exceed the Annual Hospital Utilization Threshold."

155. Wexford's contract with the State requires Wexford to pay the costs associated with referrals to external providers, such as a specialty care site or hospitals, once they exceed a particular threshold, thus economically incentivizing Wexford to keep as much medical care on State property as possible.

156. As a result of a class action lawsuit, *Lippert v. Jeffreys*, the State has been subject to a Consent Decree since May 9, 2019, regarding the provision of medical services by IDOC and Wexford.

157. The *Lippert v. Jeffreys* action resulted in the periodic evaluation of IDOC and Wexford policies, practices, and customs as they pertain to medical care by an independent monitor.

158. The Fifth Annual Report of the independent Lippert monitor was filed on August 9, 2022, and found the following:

   a. IDOC had failed to address the eight recommendations made by the independent monitor in the preceding report regarding specialty care referrals.

   b. "[D]elays and lack of coordination of care with specialists that resulted in significant morbidity and mortality."

   c. "The lack of coordination of specialty care has been a problem for the

duration of the Consent Decree and has been documented in multiple record reviews including in the mortality reviews in the appendix.

d. IDOC has not provided any information that these problems have been corrected or that they have been addressed in any way."

e. "The judgment of physicians with respect to sending patients for specialty referral and hospitalization is still not working to provide a safe and effective health program as evidenced in the Monitor's mortality reviews."

f. "Hospital physicians often provide recommendations but providers at IDOC prisons frequently fail to review these recommendations and modify the therapeutic plan based on the recommendations."

159. The first four Annual Reports of the independent *Lippert* monitor cited similar deficiencies in the provision of medical care at IDOC facilities.

160. All Lippert monitor reports provided notice to IDOC and Wexford of their unconstitutional policies, practices, and procedures.

161. The Seventh Annual Report of the independent *Lippert* monitor was released on December 27, 2023, and found the following:

g. IDOC had not initiated an analysis of their specialty care in order to improve specialty care services;

h. One of the most substantial areas for opportunities for improvement identified in reviews of patients who dies in IDOC custody was specialty care;

i. "There were multiple [opportunities for improvement] related to physician

21

oversight, physician availability, and failure to recognize or address significant signs and symptoms."

j. "The two major barriers holding back IDOC's progress toward compliance with the Consent Decree and the resulting safe, effective, and respectful health care delivery system are staffing and the physical plant deficiencies."

k. Approximately half the positions Wexford was responsible for providing were unfilled.

l. "The state needs to radically change the recruitment and hiring process and expect the same from the contract vendor."

m. "Access to specialty care, including diagnostic testing is still poor. Timeliness of specialty referral and follow up remains problematic and constituted one of the most frequent deficiencies identified in mortality reviews."

n. "The absence of physician oversight and insufficient support staff contribute to delays and poor communication about patient treatment."

o. "Reimbursement rates for specialty care providers appears to be a significant problem statewide and the state of Illinois needs to reexamine if the current method of reimbursement for offsite care is a barrier to access."

p. One third of physician positions were vacant.

162. All of these failures by IDOC that are referenced in the *Lippert* reports are substantially caused by the acts and omissions of Wexford.

163. As of December 27, 2023, 107 deaths in IDOC were reviewed by a mortality review group led by Southern Illinois University (SIU).

164. Of the 107 deaths the SIU mortality review team provided to the independent monitor, they found 899 "opportunities for improvement."

165. Nearly one fifth of the "opportunities for improvement" found by the SIU mortality review team related to specialty and hospital care, including failure to refer to specialty care or a hospital.

166. Nearly one third of the "opportunities for improvement" found by the SIU involved physician practice issues, including failure to timely refer to specialty care or hospital, failure to monitor or manage chronic illness or not managing consistent with standards of care, failure to order timely labs or tests, physician availability, failure to monitor medication management.

167. Management and treatment of a skin graft requires specialty care.

168. Management and treatment of a skin graft that shows signs of infection require specialty care.

169. Treatment of a skin graft that is failing or has failed requires specialty care.

170. Wexford providers were trained that inmates tend to lie about their symptoms in order to get permission to leave the prison facility, so providers should be skeptical of inmate's medical needs.

171. This training influenced how Wexford doctors assessed their patients and decided whether to provide outside referrals.

172. At all times relevant, Wexford implemented the following unconstitutional widespread practices and customs:

23

a.  Medical providers delay incarcerated patients' access to adequate medical care, including evaluation by specialists;

b.  Medical providers are discouraged, inhibited, disincentivized, and/or prevented from referring inmates to outside hospitals or specialists;

c.  Medical providers attempt to treat medical conditions beyond their expertise in lieu of referring that incarcerated patient to the appropriate specialist;

d.  Medical providers referring incarcerated patients to external providers, such as a specialty care site or hospital, only as a last resort, even when the needs of an incarcerated patient clearly exceed that which can be provided within an IDOC facility;

e.  Follow-up appointments are routinely not scheduled or, when they are scheduled, do not occur;

f.  When an inmate is sent to an outside provider, Wexford medical providers fail to follow their orders and recommendations;

g.  Medical providers do not properly assess inmates' needs for medical care.

h.  Medical providers do not properly engage with inmates to determine their medical needs;

i.  IDOC facilities are routinely understaffed in the medical provider roles that Wexford is responsible for filling; and,

j.  Medical providers assume that patients are lying about their symptoms.

173.  Wexford's routine failure to timely refer patients to specialty care, facilitate referrals and follow-up appointments, provide necessary specialized care in

24

their infirmary settings, and follow the orders of outside specialists have resulted in delayed treatment, poor outcomes, and unnecessary deaths, including the following:

a. When a hospital recommended that an inmate, who had been hospitalized three times with heart failure, be seen by a cardiologist, Wexford did not refer him. The inmate was kept in the prison infirmary for nine days, where

 he developed pneumonia, went into shock, and fell and broke three ribs. On the ninth day, he was hospitalized, but he died two days later;

b. A patient who needed immediate hospitalization for transfusion and diagnostic evaluation due to a life-threatening hemoglobin level was prescribed iron therapy and repeat blood county by a Wexford provider and was not followed up with for an entire year. After he finally was hospitalized and referred to oncology, his plan for surgery and oncologist recommendations were not followed by the prison facility. His condition deteriorated, and he should have been admitted to a specialized nursing unit instead of the prison infirmary. He ultimately died in prison with very little physician oversight in the last few days of his life;

c. A patient who had a cardioversion was recommended to return to his specialty provider in one month, but the referral was never made; and

d. A patient had a cardiology appointment with an outside provider, but the consult was not reviewed by any Wexford provider for fifteen days, and the Wexford provider never followed up with the patient.

25

174. Wexford also maintained an official policy in which no conduct restrictions were placed on on-call physicians, and in which on-call physicians would be unavailable to personally examine patients in the event of an emergency.

175. Pursuant to Wexford's on-call policy, on-call physicians were permitted to travel across state lines while remaining responsible for the medical care of inmates at IDOC facilities.

176. As a result of Wexford's on-call policy, Dr. Henze was permitted to travel to St. Louis while she was the on-call physician available to JTC inmates.

177. As a result of Wexford's on-call policy, no physician was available to assess Mr. Lee's injury on February 25 or 26, 2023.

178. As a result of these policies, procedures, and customs, Anthony Lee suffered painful injuries for which he was not timely referred to the appropriate specialist and ultimately lost a limb.

WHEREFORE, Plaintiff, Anthony Lee, demands judgment against Defendant Wexford Health Sources, Inc. for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT II: 42 U.S.C. 1983
### Against Defendant Dr. Marlene Henze

179. Each paragraph of this complaint is incorporated as if fully restated here.

180. Dr. Henze, in addition to being one of Anthony's treating providers at Joliet Treatment Center, was also, at all relevant times, the Facility Medical Director at Stateville Correctional Center and Joliet Treatment Center.

181. As Facility Medical Director, Dr. Henze had the authority to refer an inmate

in Stateville Correctional Center and Joliet Treatment Center to an outside hospital.

182. At all relevant times, Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

183. Dr. Henze knew that Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

184. Dr. Henze was deliberately indifferent to Anthony's serious medical need.

185. Dr. Henze recklessly disregarded Anthony's serious medical needs.

186. Dr. Henze intended to deprive Anthony of necessary treatment for his serious medical needs.

187. Dr. Henze withheld medical care from Anthony such that he endured needless pain and suffering.

188. Dr. Henze's treatment of Anthony was highly unreasonable and a gross departure from ordinary care in this situation in which a high degree of danger is readily apparent.

189. No minimally competent professional would have responded to Anthony's medical condition under those circumstances in the way that Dr. Henze did.

190. Dr. Henze failed to conform to basic standards of medical care.

191. Dr. Henze's "treatment decisions" were a substantial departure from accepted professional judgment, practice and standards, demonstrating that she did not rely on such judgment.

192. Dr. Henze persisted in a course of treatment known to be ineffective.

193. Dr. Henze chose easier and less efficacious treatments without exercising

sound and reasonable professional judgment.

194. Dr. Henze's conduct contributed to an inexplicable delay in treatment that served no legitimate penological interest.

195. Dr. Henze's deliberate indifference directly and proximately caused Anthony's injuries.

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant Marlene Henze for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT III: 42 U.S.C. 1983
### Against Defendant Dr. Dianna Kucera

196. Each paragraph of this complaint is incorporated as if fully restated here.

197. At all relevant times, Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

198. Dr. Kucera knew that Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

199. Dr. Kucera was deliberately indifferent to Anthony's serious medical need.

200. Dr. Kucera recklessly disregarded Anthony's serious medical needs.

201. Dr. Kucera intended to deprive Anthony of necessary treatment for his serious medical needs.

202. Dr. Kucera withheld medical care from Anthony such that he endured needless pain and suffering.

203. Dr. Kucera's treatment of Anthony was highly unreasonable and a gross departure from ordinary care in this situation in which a high degree of danger

28

is readily apparent.

204. No minimally competent professional would have responded to Anthony's medical condition under those circumstances in the way that Dr. Henze did.

205. Dr. Kucera failed to conform to basic standards of medical care.

206. Dr. Kucera's "treatment decisions" were a substantial departure from accepted professional judgment, practice and standards, demonstrating that she did not rely on such judgment.

207. Dr. Kucera persisted in a course of treatment known to be ineffective.

208. Dr. Kucera chose easier and less efficacious treatments without exercising sound or reasonable professional judgment.

209. Dr. Kucera's conduct contributed to an inexplicable delay in treatment that served no legitimate penological interest.

210. Dr. Kucera's deliberate indifference directly and proximately caused Anthony's injuries.

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant Dianna Kucera for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT IV: 42 U.S.C. 1983
### Against Defendant Nurse Mitchell McGladdery

211. Each paragraph of this complaint is incorporated as if fully restated here.

212. At all relevant times, Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

213. McGladdery knew that Anthony had a serious medical need that carried risks

29

of permanent, serious impairment if left untreated.

214. McGladdery was deliberately indifferent to Anthony's serious medical need.

215. McGladdery recklessly disregarded Anthony's serious medical needs.

216. McGladdery intended to deprive Anthony of necessary treatment for his serious medical needs.

217. McGladdery withheld medical care from Anthony such that he endured needless pain and suffering.

218. McGladdery's treatment of Anthony was highly unreasonable and a gross departure from ordinary care in this situation in which a high degree of danger is readily apparent.

219. No minimally competent professional would have responded to Anthony's medical condition under those circumstances in the way that Dr. Henze did.

220. McGladdery failed to conform to basic standards of medical care.

221. McGladdery's "treatment decisions" were a substantial departure from accepted professional judgment, practice, and standards.

222. McGladdery persisted in a course of treatment known to be ineffective.

223. McGladdery chose easier and less efficacious treatments without exercising sound professional judgment.

224. McGladdery's conducted contributed to an inexplicable delay in treatment that served no legitimate penological interest.

225. McGladdery's deliberate indifference directly and proximately caused Anthony's injuries.

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant,

30

Mitchell McGladdery, for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT V: 42 U.S.C. 1983
### Against Defendant Nurse Practitioner Bruckner

226. Each paragraph of this complaint is incorporated as if fully restated here.

227. At all relevant times, Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

228. Bruckner knew that Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

229. Bruckner was deliberately indifferent to Anthony's serious medical need.

230. Bruckner recklessly disregarded Anthony's serious medical needs.

231. Bruckner intended to deprive Anthony of necessary treatment for his serious medical needs.

232. Bruckner withheld medical care from Anthony such that he endured needless pain and suffering.

233. Bruckner's treatment of Anthony was highly unreasonable and a gross departure from ordinary care in this situation in which a high degree of danger is readily apparent.

234. No minimally competent professional would have responded to Anthony's medical condition under those circumstances in the way that Bruckner did.

235. Bruckner failed to conform to basic standards of medical care.

236. Bruckner "treatment decisions" were a substantial departure from accepted professional judgment, practice and standards, demonstrating that she did not

rely on such judgment.

237. Bruckner persisted in a course of treatment known to be ineffective.

238. Bruckner chose easier and less efficacious treatments without exercising sound and reasonable professional judgment.

239. Bruckner's conduct contributed to an inexplicable delay in treatment that served no legitimate penological interest.

240. Bruckner's deliberate indifference directly and proximately caused Anthony's injuries.

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant Helen Bruckner for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT VI: 42 U.S.C. 1983
### Against Defendant Dr. Eileen Couture

241. Each paragraph of this complaint is incorporated as if fully restated here.

242. At all relevant times, Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

243. Dr. Couture knew that Anthony had a serious medical need that carried risks of permanent, serious impairment if left untreated.

244. Dr. Couture was deliberately indifferent to Anthony's serious medical need.

245. Dr. Couture recklessly disregarded Anthony's serious medical needs.

246. Dr. Couture intended to deprive Anthony of necessary treatment for his serious medical needs.

247. Dr. Couture withheld medical care from Anthony such that he endured

needless pain and suffering.

248. Dr. Couture's treatment of Anthony was highly unreasonable and a gross departure from ordinary care in this situation in which a high degree of danger is readily apparent.

249. No minimally competent professional would have responded to Anthony's medical condition under those circumstances in the way that Dr. Couture did.

250. Dr. Couture failed to conform to basic standards of medical care.

251. Dr. Couture "treatment decisions" were a substantial departure from accepted professional judgment, practice and standards.

252. Dr. Couture persisted in a course of treatment known to be ineffective.

253. Dr. Couture chose easier and less efficacious treatments without exercising sound and reasonable professional judgment.

254. Dr. Couture's conduct contributed to an inexplicable delay in treatment that served no legitimate penological interest.

255. Dr. Couture's deliberate indifference directly and proximately caused Anthony's injuries.

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant Dr. Eileen Couture for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT VII: Medical Malpractice, Negligence, Respondent Superior Against Defendant Wexford Health Sources, Inc.

256. Each paragraph of this complaint is incorporated as if fully restated here.

257. At all relevant times, Wexford owed Anthony Lee a duty of reasonable medical care.

33

258. Wexford, by and through its agents and employees, breached its duty to provide reasonable medical care to Anthony Lee.

259. The Wexford employees and/or agents responsible for caring for Anthony's burn and skin graft, including Dr. Henze, Dr. Kucera, Nurse McGladdery, Nurse Practitioner Bruckner, Dr. Couture, Nurse Paramore, and Nurse Ohakosim breached their duty of care, were negligent, and consciously disregarded Anthony's safety.

260. As a result of Wexford employees and/or agents' negligent acts and omissions, Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

261. Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff, Anthony Lee, demands judgment against Defendant Wexford, for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT VIII: Medical Malpractice, Negligence
## Against Defendant Dr. Marlene Henze

262. Each paragraph of this complaint is incorporated as if fully restated here.

263. At all relevant times, Dr. Henze owed Anthony Lee a duty to provide him with reasonable medical care.

264. Dr. Henze breached her duty to provide reasonable medical care to Anthony Lee.

265. Dr. Henze breached her duty of care to Anthony and was negligent.

266. As a result of Dr. Henze's negligent acts and omissions, Wexford employees

34

and/or agents Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

267. Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff, Anthony Lee, demands judgment against Defendant Henze for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

### COUNT IX: Medical Malpractice, Negligence
### Against Defendant Dr. Dianna Kucera

268. Each paragraph of this complaint is incorporated as if fully restated here.

269. At all relevant times, Dr. Kucera owed Anthony Lee a duty to provide him with reasonable medical care.

270. Dr. Kucera breached their duty to provide reasonable medical care to Anthony Lee.

271. Dr. Henze breached her duty of care to Anthony and was negligent.

272. As a result of Dr. Kucera's negligent acts and omissions, Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

273. Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant Kucera for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

### COUNT X: Medical Malpractice, Negligence
### Against Defendant Nurse Mitchell McGladdery

274. Each paragraph of this complaint is incorporated as if fully restated here.

35

275. At all relevant times, Nurse McGladdery owed Anthony Lee a duty to provide him with reasonable medical care.

276. Nurse McGladdery breached their duty to provide reasonable medical care to Anthony Lee.

277. Nurse McGladdery breached her duty of care to Anthony and was negligent.

278. As a result of Nurse McGladdery's negligent acts and omissions, Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

279. Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant McGladdery for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

### COUNT XI: Medical Malpractice, Negligence
### Against Defendant Nurse Practititoner Helen Bruckner

280. Each paragraph of this complaint is incorporated as if fully restated here.

281. At all relevant times, Nurse Practitioner Bruckner owed Anthony Lee a duty to provide him with reasonable medical care.

282. Nurse Practitioner Bruckner breached their duty to provide reasonable medical care to Anthony Lee.

283. Nurse Practitioner Bruckner breached her duty of care to Anthony and was negligent.

284. As a result of Nurse Practitioner Bruckner's negligent acts and omissions,

36

Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

285.    Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff, Anthony Lee, demands judgment against Defendant Bruckner for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

**COUNT XII: Medical Malpractice, Negligence**
**Against Defendant Dr. Eileen Couture**

286.    Each paragraph of this complaint is incorporated as if fully restated here.

287.     At all relevant times, Dr. Couture owed Anthony Lee a duty to provide reasonable medical care.

288.    Dr. Couture breached their duty to provide reasonable medical care to Anthony Lee.

289.    Dr. Couture breached her duty of care to Anthony and was negligent.

290.    As a result of Dr. Couture's negligent acts and omissions, Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

291.    Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff Anthony Lee demands judgment against Defendant Couture for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

**COUNT XIII: Medical Malpractice, Negligence**
**Against Defendant Dr. Stathis Poulakidas**

292.    Each paragraph of this complaint is incorporated as if fully restated here.

293.    At all relevant times, Dr. Poulakidas owed Anthony Lee a duty to provide him

with reasonable medical care.

294. Dr. Poulakidas breached his duty to provide reasonable medical care to Anthony Lee.

295. Dr. Poulakidas was negligent.

296. As a result of Dr. Poulakidas's negligent acts and omissions, Wexford employees and/or agents Anthony suffered unnecessary and prolonged pain and ultimately lost a limb.

297. Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

**WHEREFORE**, Plaintiff, Anthony Lee, demands judgment against Defendant Poulakidas for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

**COUNT XIV: Medical Malpractice, Negligence, Respondeat Superior Against Defendant Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora, also d/b/a Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center**

298. Each paragraph of this complaint is incorporated as if fully restated here.

299. At all relevant times, AMA, by and through its agents, owed Anthony Lee a duty of reasonable medical care.

300. AMA, by and through its agents and employees, breached its duty to provide reasonable medical care to Anthony Lee.

301. The AMA employees and/or agents responsible for caring for Anthony's skin graft, wound, and infection, including Dr. Poulakidas, breached their duty of

38

care, were negligent, and consciously disregarded Anthony's safety.

302. Prime Healthcare Services, Inc., purchased AMITA Health Mercy Medical Center a/k/a Amita Health Aurora, a hospital facility at 1325 N Highland Ave, Aurora, IL 60506, on March 1, 2025. The facility is now called Mercy Medical Center.

303. Upon information and belief, Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center assumed care of the patients at 1325 N Highland Ave, Aurora, IL 60506.

304. Upon the purchase of the facility, Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center maintains a principal place of business continued to be 1325 N Highland Ave, Aurora, IL 60506.

305. Upon information and belief, Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center retained the same nursing staff previously employed by Presence Central and Suburban Hospitals Network d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora.

306. When Aliya of Palos Park assumed care of the patients at 1325 N Highland Ave, Aurora, IL 60506, Anthony Lee's nurses and doctors did not change.

307. When Prime assumed care of the patients at 1325 N Highland Ave, Aurora, IL 60506, Anthony Lee's medical chart continued to be housed by the same electronic records system.

308. Upon information and belief, Prime assumed some or all liabilities of its predecessor Presence Central and Suburban Hospitals Network, an Illinois not-for-

profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora.

309. Since the sale of the facility, and at all times relevant, Defendant Prime has been involved in the same business as its predecessor, which is to provide long-term nursing services to elderly and disabled patients.

310. By purchasing the same business, Prime expressly or impliedly agreed to assume liabilities of Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora.

311. As described above, during Anthony Lee's treatment at 1325 N Highland Ave, Aurora, IL 60506 he underwent unnecessary amputation surgery of his leg.

312. As the successor to Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora, Defendant Prime is liable to Plaintiff for the debts and liabilities of its predecessors, including any and all judgments rendered against its predecessors related to Anthony Lee's injuries described in this complaint.

313. Attached to the Complaint as a Declaration is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

314. As a result of Defendant Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora's employees and/or agents' negligent acts and omissions, Anthony suffered

40

unnecessary and prolonged pain and ultimately lost a limb. Attached to the Complaint is the Affidavit of the Attorney and the Health Professional's Report filed pursuant to 735 ILCS 5/2-622(a)(2).

WHEREFORE, Plaintiff, Anthony Lee, demands judgment against Defendant Defendant Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora, also d/b/a Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center, for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## V. Request for Relief

WHEREFORE, Plaintiff, Anthony Lee, respectfully requests judgment against Defendants Wexford, Henze, Kucera, McGladdery, Bruckner, Couture, Presence Central and Suburban Hospitals Network, an Illinois not-for-profit corporation d/b/a Ascension Mercy, and also d/b/a AMITA Health Mercy Medical Center, a/k/a AMITA Health Aurora, also d/b/a Prime Healthcare Services, Inc. a/k/a Prime Healthcare d/b/a Mercy Medical Center, and Dr. Poulakidas jointly and severally, for the following:

a. An award of compensatory and punitive damages;

b. An award of full costs and attorneys' fees arising out of this litigation pursuant to 42 U.S.C. § 1988(b); and

c. Any other further relief this Court may deem just and appropriate.

Respectfully submitted,

/s/ Sam Harton
Attorney for the Plaintiff

Sam Harton
Paul McMahon
Daisy Ayllon
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Suite 900
Chicago, IL  60654
Tel: (312) 253-8618
Fax: (312) 458-1004
sharton@rblaw.net
dayllon@rblaw.net

42